IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DANNY L. BALL, | ) | |
| | ) | 4:07CV3224 |
| Petitioner, | ) | |
| | ) | |
| V. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| ROBERT HOUSTON, | ) | |
| | ) | |
| Respondent. | ) | |

     Danny L. Ball (Ball) was sentenced to life in prison after he was found guilty of murder and use of a weapon to commit a felony. Because I agree that Ball's claims are procedurally defaulted and that no grounds have been shown to excuse the default or that his claims otherwise lack merit when judged by the deferential standard of review, I now grant Respondent's Motion for Summary Judgment (filing no. 26) and deny Ball's Petition for Writ of Habeas Corpus (filing nos. 1 and 23).

## *I.  BACKGROUND*

    First, I examine the state court proceedings. Next, I set out the information related to the trial, direct appeal, and post-conviction action. After that, I describe what happened in this federal case.

### *A.  Trial and Direct Appeal*

    On direct appeal, the Nebraska Supreme Court described the information pertinent to Ball's trial. *State v. Ball*, 710 N.W.2d 592 (Neb. 2006). In particular, the court's March 3, 2006 opinion provided the following accurate and detailed factual and procedural background:

About 1:30 a.m. on October 7, 2003, while in his mobile home, Randy Tomjack was stabbed 59 times. Dying, he called the 911 emergency dispatch service without giving his name or a specific address. A dispatcher sent an ambulance to the subdivision where Tomjack's home was located. The emergency responders, however, had difficulty finding the caller and asked several local residents for help.

Meanwhile, the dispatcher sent Darrick Arndt, a deputy with the Keith County sheriff's office, to the scene. From the dispatcher's information, Arndt thought Tomjack might be the caller. Arndt met the emergency response team and some subdivision residents and guided them to Tomjack's home. Shortly thereafter, Ball arrived in his truck. Before following the emergency team, a resident told Ball that they were on their way to Tomjack's home.

On arriving at the home, Arndt and Earl Schenck, the Keith County sheriff, found Tomjack dead, slumped on the couch and covered in blood. Shortly after the emergency team arrived, Ball joined the crowd at Tomjack's home. While approaching the home, he asked an emergency medical technician if Tomjack was all right. Ball next asked Arndt and Schenck what had happened and asked if he could see Tomjack because he wanted to get cigarettes from him. Schenck told him to leave the scene and if he did not leave, he would be charged with obstructing justice.

When it became apparent Tomjack was dead, Ball became distraught. Because Ball was visibly drunk, Renee Lucero, a resident of the subdivision, offered to drive Ball home in his truck. Lucero testified that Ball was crying and upset, saying he had lost his friend. On the way to his home, Ball suddenly reached over and turned off the truck's ignition. Frustrated, Lucero then pulled over, and she began walking toward the nearby restaurant where Ball worked. Ball passed out in the ditch near the truck, and later his employer picked him up and drove him to the restaurant.

After leaving Tomjack's home, Arndt and Schenck went to the restaurant to speak with Ball. Arndt noticed that Ball had recently showered and

had no physical injuries.  Ball explained that he showered after he got off work around 10:30 p.m.  Also, Schenck testified that while sitting with Ball, Ball said: "[Tomjack] made me so mad because he was lying about all the hours he was getting in this new job, and he bragged about it, and he made me so mad about that.... But I didn't want him to die." Schenck also heard Ball sobbing loudly at the restaurant.

Arndt then checked out Ball's truck and mobile home.  Arndt said that it was dark and he could not see anything in the truck, but that there was a red liquid substance on the door handle of Ball's home.  But testimony about the red liquid on the door handle differed.  Arndt testified that he did not think the substance on the mobile home was blood; Gary Eng, a Nebraska State Patrol investigator, stated he could not locate the substance; and Schenck said he never looked at it.  But Ball's employer testified without objection that the officers told him that night that they saw blood on the door of Ball's home, and then told him, "Well, we think we have got our suspect."

Between 6 and 6:20 a.m., Tim Arnold, a Nebraska State Patrol investigator, examined the truck for evidence.  Arnold stated he saw nothing suspicious from the outside of the truck.  After entering the truck, he conducted a warrantless "cursory inspection" to determine whether there were valuables present needing protection.  He admitted, however, that he did not follow the State Patrol's inventory policy and that one reason for examining the truck was to look for evidence.  He further admitted that once he arrived on the scene, he would not have released the truck to Ball.

While examining the truck, Arnold found what appeared to be blood on the steering wheel cover, on the gearshift knob, near and in the ignition device, and on the driver's-side lap seatbelt.  Despite Arnold's testimony on direct examination that he saw nothing suspicious from outside the truck, on redirect, he said that the blood was visible from outside the truck.  Arnold then had the truck towed to the State Patrol office in Ogallala, Nebraska, and applied for a search warrant.

Meanwhile, around 6:50 a.m. on October 7, 2003, when Ball tried to leave the restaurant, Arndt detained him by handcuffing him and driving him to the Keith County sheriff's station to await the arrival of Bill Redinger, a Nebraska State Patrol investigator.  Despite admitting Ball was in custody, the officers claimed he was not under arrest because they lacked probable cause to arrest him.

Ball and Arndt arrived at the jail at 7:27 a.m.  While waiting for Redinger, Ball became impatient and wanted to leave.  Despite his demands to leave the station, Ball was "detained" in a small locked room called the "attorneys' room," and all officers who testified agreed he was not "free to leave."  Angry about his detention, Ball punched holes in the ceiling tiles of the attorneys' room and had to be moved to a holding cell.

At 7:47 a.m., while waiting for Redinger, Ball told Arndt he wanted a court-appointed attorney.  Arndt informed his superior, who called Redinger to pass along that information.  Arndt's superior told him that Redinger would interview Ball.  Arndt then told Ball that he would have the opportunity for counsel when Redinger arrived.  No one informed Ball of his *Miranda* rights, nor did anyone question him while waiting for Redinger.   Redinger testified that he did not recall being told that Ball wanted a court-appointed attorney.

Redinger arrived between 8:10 and 9:15 a.m.  Redinger advised Ball of his *Miranda* rights and determined that he was not impaired by alcohol or drugs.  After Ball waived his rights, Redinger questioned him about the murder.  Redinger tried to get him to admit he was in Tomjack's home that night and that he had stabbed him, but Ball accused Redinger of "making up stories."  When Ball invoked his right to counsel, Redinger had him placed in a holding cell and told him he was being held because the officers suspected he had murdered Tomjack.

After 35 to 40 minutes, Ball told the jailer he wanted to speak with Redinger again.  Redinger confirmed that Ball asked to speak to him, advised him again of his *Miranda* rights, and then interviewed him again. During the second interview, Ball dictated a confession, Redinger wrote it down, and Ball signed it.  Both interviews were videotaped and the

-4-

videotapes were admitted into evidence.  The signed confession was also admitted into evidence.

During the second interview, Ball admitted that he went to Tomjack's mobile home that night wearing a mask, slipped in the back door, and stabbed Tomjack.  He said that he left when Tomjack uttered his name. He stated that he then burned his clothes, his shoes, the mask, and the knife in his fireplace.  After showering, he went back to Tomjack's to see what kind of damage he had caused.  It was then that he ran into the emergency team.  Ball was formally booked around 3 p.m. that day, October 7, 2003.

. . .

Eng, the lead investigator, applied for the warrants.  He stated that after Redinger's second interview, he believed enough evidence existed to justify arresting Ball.  He opined, however, that before the second interview, there was not probable cause to arrest.  Using Ball's interview statements, he drafted search warrant affidavits for Ball's truck and home. Arnold executed the search warrant for the truck at 4 p.m. that afternoon. He photographed the red stains and swabbed them; the stains later tested positive for blood.

Eng executed the search warrant for Ball's home around 2:30 p.m.  He found the blade of a large knife in the ashes of the stove.  He also seized some pipes from the shower drain of Ball's home.  The State Patrol crime laboratory analyzed the items seized, finding blood on the knife and the pipes.  But because the samples were small, the laboratory could only match Tomjack's DNA to the blood on Ball's steering wheel cover and the door of Tomjack's home.

. . .

Before trial, Ball moved to suppress his two statements and the evidence collected from his truck and home.  He alleged that the officers violated his Fourth, Fifth, and Sixth Amendment rights.  When ruling on the motion to suppress, the trial court found that Ball was in custody "from

and after 6:50 a.m. when he was handcuffed and taken by ... Arndt to the Keith County Sheriff's Office for questioning." The court also found that "as a matter of law," the officers had probable cause to take Ball into custody from and after 6 a.m.-about the time that Arnold found the blood in Ball's truck. The trial court detailed the following facts in its order:

A. Randy Tomjack had been stabbed and killed in a rural area on the north side of Lake McConaughy in Keith County, Nebraska, just before 1:34 a.m. on October 7, 2003.

B. Albee's Subdivision where the 911 call came from, is a resort area comprised of cabins and mobile homes which are generally unoccupied after the summer vacation season.

C. While investigating the homicide, Sheriff Earl Schenck and Investigator [Darrick] Arndt observed [Danny L. Ball] between 2:30 a.m. and 3:00 a.m. come to [Tomjack's] mobile home asking about the condition of ... Tomjack and wanting to borrow cigarettes. [Ball] was unusually persistent and inquisitory about Tomjack, and had to be threatened with arrest by the Keith County Sheriff when the Defendant would not leave the premises.

D. [Ball] had recently showered. Although [Ball] states that there is a neutral explanation for this fact, it is a suspicious and unusual behavior during the hours immediately preceding or following midnight.

E. Sheriff Schenck had been advised by Ball that Ball had not seen Tomjack for two days prior to October 7, 2003, but Ball later advised the sheriff that Tomjack had been to [Ball's] residence at approximately 11:00 p.m. on October 6, 2003. [Ball] had not answered the door. Sheriff Schenck further overheard Ball crying in the bathroom of [the restaurant where he worked] stating "I didn't want him to die, Tomjack always lies, but I didn't want him to die."

F. At 6:00 a.m. on October 7, 2003, [Ball's] vehicle was inspected on the grass shoulder of Highway 92 and suspected drops of blood were observed on the steering wheel cover, gear shift knob and seatbelt.

-6-

[Tomjack] had been repeatedly stabbed.  Copious amounts of blood [were] observed surrounding his body.  It was reasonable to assume that the assailant would have had blood on him or his clothing following the incident.

The court found that even if it was "incorrect on the issue of probable cause to arrest," Ball's second confession was an act of free will sufficient to purge the taint of unlawful detention under the Fourth Amendment.  Similarly, the court found that under Fifth and Sixth Amendment precedent, Ball waived his right to counsel by initiating the conversation with Redinger.  Thus, the court suppressed Ball's first statement, but admitted the second.

Regarding the warrantless search of the truck, the court found that the evidence of bloodstains was admissible under the plain view doctrine and that the evidence inside the truck would inevitably have been discovered later that day by the State Patrol when they inventoried the truck. Because the trial court excluded only the first statement, it concluded that the search warrants contained sufficient probable cause.

. . .

At trial, the court overruled Ball's continuing objections to admitting the confession, the sight of blood in his truck, and the evidence obtained using that evidence.  When overruling Ball's renewed motion to suppress, the court stated that the evidence at trial was stronger than the evidence at the suppression hearing because of the testimony of Ball's employer. The court accepted the employer's recollection that the officers who secured Ball's home believed the red substance on the door was blood, and the court concluded that this strengthened probable cause to arrest Ball.

The jury convicted Ball of first degree murder and use of a weapon to commit a felony.  The court sentenced him consecutively to life imprisonment without the possibility of parole for the murder and 5 to 10 years' imprisonment for the weapon charge.  Before sentencing, Ball moved for a new trial, primarily renewing his suppression argument.  The

court reiterated that it believed the evidence adduced at trial was more compelling than that from the suppression hearing and overruled the motion for new trial.

*Id.* at 598-601.

Ball's trial lawyers also appeared for him in the direct appeal. They presented the following arguments to the Nebraska Supreme Court: (1) the trial court erred in denying the motion to suppress Ball's statement to Redinger because Ball was arrested without probable cause; (2) the statements given to Redinger by Ball should have been suppressed because Ball had requested counsel; (3) Ball's Sixth Amendment rights were violated by Redinger and any subsequent waiver was tainted; (4) the trial court erred in refusing to suppress the search of the pickup because the items were not in plain view; and (5) when considering the sufficiency of the search warrant affidavit for the residence and the pickup, the trial court should have excised Ball's statements obtained during the illegal arrest and the illegal search and seizure of the pickup. (Filing No. 25-2, Attach. 1, at CM/ECF p. 2 (Ball's direct appeal brief).)

Judge Connolly, writing for a unanimous Nebraska Supreme Court, rejected those arguments and affirmed Ball's conviction and sentence. In particular, he wrote that: (1) the blood in the truck would have been inevitably discovered pursuant to the Nebraska State Patrol's standard policy of inventorying abandoned vehicles and thus the trial court did not err in refusing to suppress that evidence even if the truck was illegally searched as an initial matter, *Ball*, 710 N.W.2d at 602-04; (2) the police had probable cause to arrest Ball when judged against the Fourth Amendment, *id.* at 604-06; (3) Ball's confession was not subject to suppression under the Fifth Amendment because Ball knowingly and intelligently waived his *Miranda* rights after initiating the second interview with Redinger, *id.* at 606-08; (4) no Sixth Amendment right to counsel attached before Ball was formally charged and thus Ball's request for counsel prior to being charged did not implicate the Sixth Amendment, *id.* at 608; and (5) the trial court properly evaluated the sufficiency of the search warrant affidavits because

-8-

the evidence of bloodstains from Ball's pickup and the evidence of his confession were properly admitted at trial and thus the affidavits which relied upon that evidence were not invalid. *Id.*

### B. State Post-Conviction Action

On December 4, 2006, Ball, proceeding pro se, filed his motion for post-conviction relief. (Filing No. 25-5, Attach. 4, at CM/ECF p. 1.) The motion was brief and contained few details. It simply stated:

(1)    The defendant was wrongly convicted of Murder in the First Degree and use of a Weapon to Commit a Felony by a Jury Trial held on November 15-18, 2004, from which the defendant was sentenced on January 10, 2005 to the custody of the Nebraska Department of Corrections.

(2)    On January 11, 2006, defendant's appeal was submitted and argued before the Nebraska Supreme Court, and on March 3, 2006, the court affirmed by opinion the decision of the lower court, and on March 14, 2006, the Mandate was issued.

(3)    The defendant was not notified of the Nebraska Supreme Court's decision and mandate until October 31, 2006, when the defendant requested said case status from the court.

(4)    The defendants [sic] legal counsel, appointed by the court, was ineffective at best.

(*Id.*)

On January 4, 2007, the state district judge who tried the underlying criminal case denied and dismissed the motion finding no basis upon which to grant relief or to order an evidentiary hearing. (Filing No. 25-6, Attach. 5, at CM/ECF p. 1.) Ball,

-9-

again proceeding pro se, appealed to the Nebraska Supreme and submitted a brief making 14 assignments of error. (Filing No. 25-7, Attach. 6, at CM/ECF pp. 7-11.)

The Nebraska Attorney General filed a motion requesting that the Nebraska Supreme Court summarily affirm the denial of the post-conviction action. The Attorney General argued that Ball had alleged no factual or legal basis in his motion for believing that counsel was "ineffective at best" and thus relief was properly denied. (Filing No. 25-8, Attach. 7, at CM/ECF p. 11.)

On October 31, 2007, the Nebraska Supreme Court sustained the motion for summary affirmance and affirmed the district court. (Filing No. 25-9, Attach. 8, at CM/ECF. p. 1.) It did so pursuant to Rule 7B(2). (*Id.*)

Rule 7B(2) provided:

A motion to affirm on the ground that the questions presented for review are so unsubstantial as not to require argument may be filed after the appellant's brief has been filed or the time for filing has expired. Such a motion shall document the claimed lack of substance of the questions presented by citations to the dispositive portions of the record and to the controlling statutory and case law.

Rule 7B(2), *Rules of Practice and Procedure in the Nebraska Supreme Court and Court of Appeals* (West, June 3, 2008)[1] (pertaining to summary dispositions).

---

[1]The quotation in the text accurately reproduces Rule 7B(2) as it existed in 2007. For the sake of completeness, however, I note that the Nebraska Supreme Court Rules were amended July 2, 2008, effective July 18, 2008. *See Nebraska Judicial Branch*, "Supreme Court" and "Rules," available at http://www.supremecourt.ne.gov/rules/ (last accessed September 26, 2008).

-10-

## C.  This Federal Action

Ball commenced this action September 18, 2007 (filing no. 1), and then he filed an amended petition on March 18, 2008.  (Filing No. 23.)   I initially reviewed the amended petition and concluded that seven claims were potentially cognizable. Condensed and summarized, those claims were:

Claim One:     Petitioner's conviction was obtained as a result of ineffective assistance of counsel *because* Petitioner's trial counsel previously represented the victim, failed to investigate evidence, challenge testimony, or assert an alternate "theory of the crime," and did not call witnesses to testify in Petitioner's defense.

Claim Two:     Petitioner's conviction was obtained by use of evidence gained pursuant to an unconstitutional search and seizure *because* Petitioner's vehicle was initially searched without a search warrant or probable cause, and subsequent search warrants "failed to mention" that the vehicle had been previously searched and left "unattended and unsecured" between searches.

Claim Three:   Petitioner's conviction was obtained by use of evidence secured pursuant to an unconstitutional arrest *because* Petitioner was arrested without probable cause.

Claim Four:    Petitioner's conviction was obtained by use of a coerced confession *because* Petitioner was held in a cold cell without a sink, toilet, or bedding.

Claim Five:    Petitioner's conviction was obtained by the unconstitutional failure of the prosecution to disclose evidence favorable to the defendant *because* the

-11-

prosecution failed to disclose that Petitioner's keys "had no blood on them," failed to "conduct conclusive testing on the drain pipes and knife," failed to "produce photographic evidence that would impeach" witness testimony, and did not collect or produce evidence that would prove third party guilt.

Claim Six:        Petitioner's conviction was obtained as a result of ineffective assistance of appellate counsel *because* Petitioner's appellate counsel failed to take witness statements, inspect evidence, challenge evidence, or call witnesses to testify in Petitioner's defense.

Claim Seven:      Petitioner's conviction was obtained in violation of his constitutional right to a speedy trial *because* Petitioner's trial was subject to lengthy delays.

(Filing No. 24, at CM/ECF pp. 1-3.)

A progression order was entered, and pursuant to that order Respondent filed a motion for summary judgment accompanied by the pertinent state court records. (Filing Nos. 25 and 26.)   The matter was briefed.  (Filing Nos. 27, 47 and 53.)[2]

## II.  ANALYSIS

Claim 1 (ineffective assistance of trial counsel), Claim 4 (coerced confession), Claim 5 (failure to disclose favorable information), Claim 6 (ineffective assistance of

---

[2]Also pending are two motions submitted by Petitioner.  One is a motion for DNA testing.  (Filing No. 49.)   That motion will be denied as moot because Petitioner's petition for habeas corpus must be denied.  The other motion (styled "Objection & Travers") is really an additional brief explaining why Petitioner does not think I should grant the summary judgment motion.  (Filing No. 55.)  Treated as a motion, that pleading will be denied because it lacks merit.

-12-

appellate counsel) and Claim 7 (speedy trial violation) have been procedurally defaulted without excuse.  The other two claims (Claims 2 and 3) have not been procedurally defaulted, but they lack merit when judged by the deferential standard of review.

### A.   Procedural Default of Claim 1, and Claims 4-7

The general principles applicable to the procedural default question are summarized next.   After that, I apply those principles to this case.

First, a habeas petitioner must "fairly present" each claim he or she wishes to litigate in federal court to the state courts.  28 U.S.C. § 2254(b)(1).  A general claim is not enough; it must be specific and similar to the claim presented in federal court. Anderson v. Harless, 459 U.S. 4, 6 (1982) (A claim is properly presented when the state courts are given a " 'fair opportunity' to apply controlling legal principles to the facts bearing upon [the claim].") (quoting Picard v. Connor, 404 U.S. 270, 275, 277-78 (1971)).  In order to "fairly present" a claim, the specific claim must also be put through one complete round of the State's established review process.  O'Sullivan v. Boerckel, 526 U.S. 838, 847 (1999).

Second, under Nebraska law, a "motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." State v. Lotter, 664 N.W.2d 892, 911 (Neb. 2003);  See also Akins v. Kenney, 410 F.3d 451, 455-56 n. 1 (8th Cir. 2005).

Third, under Nebraska law, if you attack the effectiveness of trial or appellate counsel in a post-conviction action, you must be specific and conclusions will not suffice. State v. Nesbitt, 650 N.W.2d 766, 779 (Neb. 2002) (conclusory allegation that attorney rendered ineffective assistance was insufficient to state a claim for post-conviction relief; the petitioner made no allegations regarding the specific factual

-13-

context of the claim and thus the trial court correctly denied the motion without an evidentiary hearing).

Fourth, Nebraska courts "will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion. The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity." *State v. Moore*, 718 N.W.2d 537, 542 (Neb. 2006) (death penalty case holding that constitutional challenge to statutorily mandated method of execution was procedurally barred) (internal citation omitted), *cert. denied*, 127 S. Ct. 1134 (2007). In this connection, if you file an ineffective assistance of counsel claim in one post-conviction action, you cannot file another such action by changing your assertion about how your lawyer erred. *See*, *e.g.*, *State v. Luna*, 434 N.W.2d 526, 528 (Neb. 1989) (holding that district court's order denying an evidentiary hearing and overruling prisoner's motion for post-conviction relief alleging ineffective assistance of counsel was not erroneous, where defendant had previously made a motion for post-conviction relief alleging ineffective assistance of counsel which was denied, even though allegations in new motion were grounded in different errors allegedly committed by counsel as compared with those cited in prior post-conviction relief attempt).

Fifth, if a petitioner fails to "fairly present" his claim to the state courts, and he can no longer present the claim to the state courts because, for example, a state court rule prohibits serial litigation, then the federal court will be precluded from considering the claim unless the petitioner fits into one of two exceptions. *See*, *e.g.*, *Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir.2006), *cert. denied*, 127 S. Ct. 2256 (2007). That is, the petitioner must demonstrate "cause and prejudice" or a "miscarriage of justice" (like "actual innocence") in order to prosecute a claim when that claim has not been, and cannot be, fully and fairly asserted in the state courts. *Id.*

-14-

Sixth, the "procedural default doctrine and its attendant 'cause and prejudice' standard . . . apply alike whether the default in question occurred at trial, on appeal, or on state collateral attack." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (cause for procedural default of another federal claim could itself be procedurally defaulted). In that regard, a federal habeas court is barred from considering an ineffective assistance of counsel claim as "cause" for the procedural default of another claim if the ineffective assistance claim has itself been inexcusably procedurally defaulted. *Id.* at 451-452.

Applying the foregoing general principles to this case, I come to the following specific conclusions:

\*      Claim 1 (ineffective assistance of trial counsel) and Claim 6 (ineffective assistance of appellate counsel) were never fairly presented to the Nebraska courts. Petitioner's state post-conviction motion said only that "legal counsel, appointed by the court, was ineffective at best."  That snippet was plainly insufficient to fairly present the specific claims asserted here to the Nebraska courts.  Because Nebraska does not allow for successive post-conviction motions, the ineffective assistance of counsel claims presented here can never be presented to the Nebraska courts. Accordingly, those claims are procedurally defaulted.

\*      Claim 4 (coerced confession), Claim 5 (failure to disclose favorable information) and Claim 7 (speedy trial violation) have never been presented to the Nebraska courts.  They cannot be presented now because Nebraska does not allow for post-conviction actions raising issues (like Claims 4, 5 and 7) that could have been raised on direct appeal.  Even if that were not true, Nebraska will not allow for the presentation of claims that could have been presented in an initial post-conviction motion, so Petitioner cannot go back to the state courts to try present these claims in a second state post-conviction action.

\*      Petitioner has wholly failed to excuse these defaults.  That is, he has failed to show "cause" and "prejudice" and he has failed to show "a miscarriage of justice" like "actual innocence."

## B.  Deferential Review of Claims 2 and 3

Giving Ball the benefit of the doubt, I assume, without deciding, that Claim 2 (unconstitutional search of vehicle) and Claim 3 (unconstitutional arrest) were "fairly" presented to the Nebraska Supreme Court in the direct appeal.  That said, those claims must be denied on the merits.

When a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the facts and the law.  *See* 28 U.S.C. § 2254(d).  With regard to the deference owed to factual findings of a state court's decision on the merits, a federal court is bound by those findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).  With regard to the deference owed to the conclusions of law set forth in a state court's decision on the merits, a federal court may not grant a writ of habeas corpus unless the state court's legal conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

I have carefully reviewed the decision of the Nebraska Supreme Court as it pertains to Claims 2 and 3.  Suffice it to state that the Nebraska Supreme Court's decision on those claims is entitled to deference and Petitioner has not given me any

-16-

reason to doubt that the court fairly found the facts and properly applied federal legal principles to the federal questions.  Thus, Claims 2[3] and 3 will be denied on the merits.

   IT IS THEREFORE ORDERED that:

1.   Respondent's motion for summary judgment (filing no. 26) is granted as provided herein.  Petitioner's Petition for Writ of Habeas Corpus (filing nos. 1 and 23) is denied and dismissed with prejudice.  A separate judgment will be issued.

2.   Petitioner's motion for DNA testing (filing no. 49) is denied as moot. Petitioner's "Objection and Travers" (filing no. 55) is denied.

October 2, 2008.                         BY THE COURT:

                                         *s/Richard G. Kopf*
                                         United States District Judge

_____

   [3]In a related vein, to the extent Claim 2 raises a Fourth Amendment issue, that issue is also foreclosed because Nebraska provided Petitioner with a full and fair opportunity to litigate that issue before the state trial judge, Nebraska also provided Petitioner with a full and fair opportunity to present that issue on appeal and thus *Stone v. Powell*, 428 U.S. 465, 482 (1976) bars me from second guessing the state courts.  *See*, *e.g.*, *Chavez v. Weber*, 497 F.3d 796, 801-02 (8th Cir. 2007) (Defendant had an opportunity for full and fair litigation of his Fourth Amendment claim as to drug evidence obtained from searching his vehicle, and thus, *Stone* barred federal habeas review of that claim, regardless of whether narcotics canine sniff preceding the physical search was a Fourth Amendment search; state provided a corrective mechanism for any error the trial court may have made in admitting the evidence by allowing defendant to appeal his convictions to the state supreme court).